The next and final case on the call this morning is Addison Insurance Company, I believe, versus Donald Fay. Are the parties ready? Yes, sir. You ready to proceed? Yes, sir. If I may. Good morning, Your Honors. May it please this Honorable Court, my name is Jay Luxinger. I'm with the law firm of Horwitz Horts and Associates, and I represent the family of Everett Hodgins, one of the boys who died tragically in this case. With me today is Mike Mahoney, who represents the other lad, Mr. Carr, Justice Carr. Your Honors, I believe that there's three primary issues, questions before you today. The first is whether or not the appellate court committed error when it failed to properly apply the test for cause theory as enunciated by this Court in the Nyquist case. The second question is whether or not the appellate court committed error when it overruled the factual findings of the trial court in the declaratory judgment action underlying this matter when it failed to apply the against the manifest weight of the evidence standard. The third question is whether or not the appellate court committed error when it failed to find that the insurance company, the Edison Insurance Company, failed to meet their burden to show that the limiting single occurrence provision applied. I respectfully submit to you that the answer to all three of those questions is yes. But I also argue to you that you do not have to answer yes to all three of those questions. If you answer yes to any of those questions, I respectfully submit you must overturn the appellate majority's decision. Now, I think, I would also say that I think the underlying and primary rationale that gives rise to a yes answer to all three of those questions is found in the cogent reasoning in Justice Wright's dissent in this case. I think it's important to keep in mind that in this matter, during the trial, a bench trial, with the judge sitting as a fact finder, that the pertinent, relevant, and salient facts were, came into evidence through the testimony of two investigating police officers and a medical examiner, all of which were stipulated into evidence by both sides. That was a question I had, counsel. Was all this testimony, was everything presented to the trial court by stipulation? I would say yes. Yes. So how did the trial court engage? There were no live witnesses. How did the trial court engage in any kind of an assessment of credibility that we couldn't do from the same record? Well, because the answer to that question is both yes and no. And here's what I mean by that. We put a reader on the stand, as you would with any evidence deposition, and I hasten to add that during the original depositions of the police officers, in which they testified, one, that they had professional training in forensic investigation, and during those depositions they also brought forward, and was put in evidence also, the photographic evidence of the scene, the positioning of the boys, the location of the boys in relationship to each other, the nature of the pit. This was, as the testimony was read, questions and answers were read to His Honor the trial judge, those photographs that the investigating officers used as a underpinning of their testimony to explain their testimony and to demonstrate why their testimony was founded in sound logic, that was also shown to the trial judge. Aren't those photos a part of the record in this case? They certainly are a part of the record. That is true. And it wasn't the officers that presented this. I mean, you just had a reader read the answers. That's true, Your Honor. Pardon me. Excuse me. No, I just want to make sure I'm clear on exactly what happened below. That is what happened below, Your Honor. But I would submit that is what happens in almost every case where you have a evidence deposition. If you don't put it on via video, you put an evidence deposition on in a trial with a reader. We've all done it on many, many occasions, and the same standard against the manifest way to the evidence applies, as it should apply here. Excuse me. Then did the appellate court rely on any evidence that was not established by the record? There were no, to the best of my recollection, if I may, Your Honor, during the appellate argument they did not refer to any photographs. They were not shown any photographs. They did not refer to any photographs in their ruling. I'm asking about how the boys entered the property. Was there any evidence to that in the record? Zero. Zero. Nothing whatsoever. There was not a scintilla of evidence as to how the boys entered the property, when they entered the property, and respectfully. In the majority's opinion, when the majority rests their opinion in large measure, I presume, because they cited it, stating that the boys traveled to the pit together, entered simultaneously, and got caught within moments of each other, respectfully, there was not one scintilla of evidence to support that. And I argue that insofar as the police officers, using the photographs during trial and their own observations, when the officers testified, that in their opinion, both of them testified, that the boys, one entered, it looked like he entered and tried to jump the puddle at the bottom of the pit, and the other boy, who was found facing directly away from him, one boy had two feet caught, as you probably recall, and he was entrapped in the muck. One boy was found facing the other way. He had to go around the other side of the pit and enter, with one foot caught, looking like he was trying to rescue the boy. And that's why the officers, amongst other reasons, that they reached those opinions. That testimony, I respectfully submit, contradicts an assertion that the boys entered simultaneously. What's the standard of review in this case? Well, it certainly is de novo for whether or not an insurance company, pardon me, it's de novo with regard to interpretation of an insurance contract. It's certainly against the manifest weight of the evidence for whether or not the facts finder found facts appropriately. Mr. Luxer, I understand this isn't your primary argument, but just picking up on what Justice Garmon asked, even under the time and space analysis, which is not the analysis that you think should be used, I mean, am I right so far? Yes, Your Honor. Right, because you want this court to follow the Nyquist case, which you've already indicated. Absolutely, Your Honor. But even under that time and space analysis that the majority relied upon, is it your position, did I just hear you say there's simply no evidence showing that the boys entered the excavation pit simultaneously? There is none. Nowhere in the record. And there's no evidence that they became entrapped in the muddy soil within moments of each other? There's no evidence of that. So is that an alternative position, that even under the majority analysis, you feel there's nothing to support the time and space analysis employed by the majority? Yes, that's true, Your Honor. And I would also just cite, if I may, I believe that I found, to me, it's somewhat inexplicable that the majority opinion in what they correctly cited, the standard and the test enunciated by this court in NYCOR, but then immediately go on to a discussion of this time and space analysis, which is clear that the time and space analysis, which is at least discussed or mentioned in Sepkiewicz's case, that case was extant at the time of the NYCOR decision. NYCOR favorably embraces a decision in Mason, which there's no time and space analysis discussed in Mason or utilized in Mason. But this court chose not to include a time and space component or element, even though Sepkiewicz had discussed it. But I would also point out that if we look at Sepkiewicz, the language in Sepkiewicz also militates against applying a time and space analysis in this instance. As you may recall, in Sepkiewicz, you have an instance where there was a truck, caused an accident on the, someone ran into a truck that was on a highway. The truck is moved 12 feet. And I think it was either three minutes or five minutes later, the truck is struck again. There was an argument where they said the time was argued, well, this has to be one occurrence. And the Sepkiewicz court discusses time and space analysis. But then the Sepkiewicz court, and it was a first district case, the Sepkiewicz court states this. It states that because there was not an uninterrupted continuum that was once set in motion, leading to multiple injuries, then you can't apply time and space analysis. They found multiple occurrences. Can we get to the multiple occurrences a minute? There were, just so I have the facts straight, there were no eyewitnesses, right? No eyewitnesses, Your Honor. Right. No one testified as to the times of the entrapment or the times of death, right? There was testimony as to the times of entrapment. And that testimony was from the officers who said, based on what we saw, we can conclude and do conclude that they entered at different times, but we can't say what interval between. It could have been minutes. It could have been hours. We can't say. They did say they entered at different points. They didn't enter at the same point. They entered at different points, and they entered for different reasons. So based on that testimony, that's where you come up with the independent acts, namely, one cause of death was a boy being stuck in the mud. One cause of death was the intention to save the other boy. Yes, I agree, and we agree, with the reasoning propounded in the dissent, whereby if we apply the separate and intervening human act that increases insurance exposure liability, you have one boy enters by accident, we'll presume, or maybe enters because he wants to jump over a puddle, and that's what some young boys may want to do. There's no evidence at all that the second boy ever would have entered that pit for any other reason, but for the fact that one lad, one boy was caught. So the separate and intervening human act is one enters for one reason at one point in time at one location, the other at some unknown point in time discovers that that person is in that position and then makes a separate and intervening human act. Now, help me out on the testimony regarding that, with there being no eyewitnesses. Was this speculation, surmise? How do you get to the point of these two independent acts? Well, I get to it two ways. One, it's not speculation because it was stipulated to by the other side. If there's an objection to speculation, then you raise the objection that this testimony cannot be admissible. The admissibility was stipulated to. If you're going to object to speculation and say this can't be admitted because it's speculative, you have to raise the objection that it was not done. And that was the officer's testimony. That was the officer's testimony. But further, I believe that when the officers testified, based on their, they were the forensic investigating officers who went to the site. They viewed, unfortunately, they viewed the bodies, they helped retrieve the bodies, and they did an analysis as to what happened and the circumstantial evidence as to where the boys were in terms of facing in different directions and the way their bodies were caught differently and trapped in the muck differently. This is circumstantial evidence that further support serves as a basis for the police officers' opinions, again, which were not contested in any way at trial. And certainly I think the fact finder, the trial judge, was certainly proper in concluding that that being the testimony of record, that the facts were as the trial judge concluded. So, Your Honors, I would just end at this point, if I may. I just wanted to point out one thing that I believe. Mr. Flushinger, it seems that the appellate court, the appellate court's focus, and based upon the complaints that were filed, the focus was on the alleged negligence, the alleged negligence being the failure of the quarry or the parish to properly secure the pit, to keep people from getting into it. And the appellate court makes the statement with regard to the time and space, I guess, that the boys left home together to go fishing at the same time and didn't come back. Is the focus on the alleged negligence in the complaint, or should our focus be on what happened when the boys got into the pit, which caused their death? I think the focus, Your Honor, should be in applying the NICRA test, separate and intervening act, that each of the separate and intervening acts of the boys that led them to get into the pit at separate times, in all likelihood, at separate times for separate reasons, that that's where the focus of the court should be, because that's the focus that is placed in the test by this Honorable Court in the NICRA test. But in NICRA were not all of the separate intervening acts of the power company in changing the mercury out of those old regulators? Well, yes and no, insofar as some of them were independent contractors, but in that regard, yes, that's true. But the test does not say that it has to be an intervening act of a tortfeasor, of a potential tortfeasor. I think that's the real gist of this, isn't it? Should it be a separate intervening act of the tortfeasor, or is it a separate intervening act of, in this case, the victims? Well, and not to dodge it, but I would answer that somewhat rhetorically. I had posited in my argument, both before the trial court and the appellate court, that under the theory as propounded by the insurance company, if after the boys were entrapped, if an hour later a police officer came and went down there and tried to rescue them, and he or she got caught, and then later, five minutes later, one of the parents looking for them, they came down and got caught, this is all one occurrence. But that is not how the test reads, and that's not how it should be applied. I would certainly concur that I think the NICOR court uses an example that if someone careened out of control and that someone was to strike three cars in a row that were parked, that might be a single occurrence using, again, the sequence language of an uninterrupted continuum once set in motion. But we don't have that here. We have, as Justice Wright, I believe, aptly points out, we have one lad getting entrapped for, we have evidence for the reason he went in there was perhaps to jump, and did try to jump, the water. But for, pardon me, the evidence I believe is clear that there's no evidence that the other boy would ever have gone, chosen to go, into that pit for a different reason at a different point at a different time, but for that fact. This is not an uninterrupted continuum. It's a separate and intervening human act. And the fact that it was done, if you look at the Mason case, the people who entered the restaurant to buy the food, they just went into the restaurant for their own reasons. So the fact in this instance that the person who made the decision to embark upon a course of action was not a potential tortfeasor, or not a tortfeasor in this case, that is not addressed by the test, and I don't think the test clearly does not require that. So help me here. Did he answer your question? So we should focus on the conduct of the boys and not the conduct of the landowner? Well, I think that we have to focus on both. Clearly, you have a landlord that had created or permitted to create an unsafe condition. I mean, there's no question that we've alleged, and the whole underlying case was based on the fact, that there was a negligent condition created. But as Justice Wright points out, I want to refer to her thinking again, and I just would answer that question with Justice Wright's words, if you'll permit me, because I think she does it more eloquently than I do. She states at the end of her dissent, Applying NICOR to the scenario advanced by Addison, one boy became entrapped by accident, and the other boy deliberately entered the pit, heroically aware of the hazard. These were separate entries, separate intentions, separate acts, and should be viewed as separate occurrences. The occasion of friendship should not negate the separateness of each tragedy. And she goes on from there. I believe that we must focus on both. It's not merely the fact that there was a negligent condition, but it was separate and intervening human acts that led each boy to his terrible and tragic demise. And that is two events. And I believe under our law, then, that's two occurrences. Thank you very much. Thank you. Good morning, Justices. My name is Jean Golden, and I represent Addison Insurance Company in this matter. Initially, I would briefly like to address the standard of review issue that's been presented. The appellate court correctly determined that a de novo review was appropriate. The trial court in this case considered only documents and deposition transcripts. Excerpts from those transcripts were read into the record by both parties. The law is very clear that where that is the case, an appellate court is not bound by the trial court's findings and can make an independent decision on the facts. The defendant seems to be claiming ñ Ms. Golden? Yes. Excuse me. Were those deposition transcripts, were those evidence depositions as opposed to discovery depositions? No, they were discovery depositions, Your Honor. All of them were. Were there no evidence steps? There were no evidence steps. They were all discovery depositions. Ms. Golden? Yes, sir. And I'm sure you're going to get into this, but you heard me ask some questions to Mr. Luksic, or even relating to this time and space analysis. There's a quote in the majority opinion that says, there is simply no evidence to support the majority ñ well, let me just put it this way. The quote actually is, the boys entered the property together, journeyed across the same path, leading into the excavation pit simultaneously, and became entrapped in the muddy soil within moments of each other. And I started by saying there's no evidence ñ I don't see any evidence, but what evidence in the record supports that conclusion? The police officers determined that the boys were likely heading home from the fishing pond because the weather had changed and a storm was coming up, that they were likely taking a shortcut to Carr's house,  that they intended to jump over the pit as opposed to walk around it because that would have taken too much time, that one boy went in first, was attempting to jump and fell, and the other boy entered behind him. How large was the pit? Dr. Case, I'm so sorry. How large was the pit? Oh, you're asking. Was the distance from one side to the other? I'm going to really be taking a stab here. I tried the case, and I don't remember the answer to that question. Why? You know, I want to say perhaps half a mile around, but I'm guesstimating there, Your Honor. I'm sorry. I don't remember specifically. Is there evidence in the record? Is there any foreground? As to the size of the pond, yes. Yes. Yes, there is. But the officers, because they weren't there and there were no eyewitnesses, that's speculation, isn't it? But didn't the officers conclude? Those were the conclusions that they made. That they entered different times, not simultaneously as the appellate court said. I believe that that is speculation, that they entered at different times in terms of one trying to save the other. But then the appellate court would have engaged in speculation as well, saying they entered at the same time. Well, what I believe is that the most reasonable inference to draw from the facts that were presented, Your Honor, is that, in fact, the boys were together, they left together, they were together when they died, and that they both entered that pit at the same time or shortly after one another. Those were the conclusions and beliefs of the doctors who testified as well. Dr. Case felt that the boys would most likely have entered at approximately the same time and that they died in very similar ways, one from hypothermia, one from hypothermia drowning secondary to hypothermia. Their bodies were on top of each other, next to each other, touching, Dr. Bloom said, actually on top of each other. But that was days later when they were found. That was when they were found, yes, but they were obviously together. I mean, their bodies were touching, and, in fact, one boy's body was on top of the other. The doctors actually felt that they were probably cuddling together because they were attempting to keep warm as their bodies were succumbing to hypothermia. Was there testimony in the record that wasn't objected to, Ms. Golden, that indicated that by the police officers, and listening to opposing counsel, that indicated that one of the boys went in later to try to save the first boy? Was there that unobjected testimony in the record? Your Honor, the contention with respect to objections is, in my opinion, disingenuous. The parties stipulated that depositions would be submitted to the court and that excerpts from the depositions would be read by both parties. That was done. That was done by Addison. No objections were asserted by the defendants to any of the testimony pointed out to the court by Addison. In the same way, we did not make objections when they were reading their depositions. The court agreed that that was the process that we would follow. No one objected. And it was agreed that we would argue weight and reserved all rights with respect to weight of testimony. We submitted, as I indicated, the testimony of the officers in which they concluded, based on their investigation, that the boys were together, that they were attempting to get to Carr's house, which was, in fact, very close to the place where they were injured, that a storm was coming, that their bodies were touching. We submitted the testimony of Dr. Case and Dr. Bloom. Both doctors said that they believed the most sensible and reasonable inference that you could make here was that the boys were together and died at approximately the same time. Is there any dispute from the depositions that the boys entered from different sides of the pit? No. And you don't know the exact time from one side to the other? I do not. I apologize. It is in the record, Your Honor, but I simply do not recall the dimensions of the pit. The principal authority for the analysis, the time and space analysis, is the Doria case out of New Jersey. Is that right? I think the court noted that case because it involved the deaths of two boys in a swimming pool, yes. And I think that the court was utilizing that in connection with the time-space analysis that it applied. But it was also referencing NICOR and subcourts. That's my question, Ms. Golden. So your case doesn't rise or fall in whether we look at the time-space analysis that came out of this New Jersey case? Absolutely not. You think under NICOR you prevail as well? Under NICOR, I absolutely believe that we prevail. What are the separate ‑‑ each asserted loss is the result of a separate and intervening human act, whether negligent or intentional. That was the holding of NICOR, right? How does that fit with these facts to support your position? There are no separate and intervening acts of Donald Parrish that occurred in this case that would have ‑‑ that would allow the conclusion that he acted differently so as to cause the death of one boy in one manner and the death of another boy in another manner. Can you go to Justice Carmichael who asked about his question regarding whether you look at the acts of the tortfeasor or the victim? Absolutely. And I believe that NICOR clearly demonstrates, clearly states that you look at the acts of the insurant. In fact, those words are quoted by the court or stated by the court in the decision that I was just ‑‑ I have the page here. It is page 428 of the Yale Second Cite and states, citing Mason, with approval the proposition that the type of activity in which the insured engages should be considered in determining the number of occurrences. In reading Shackelford's brief, I was struck by how many times the appellants refer to the conduct of Justice Carr and Everett Hodges as controlling on this issue. I believe they are fundamentally misinterpreting NICOR and established Illinois case law. They are seeking to have this court implement a rule that will unduly burden insurers and require them to go through tortured analyses of the acts of plaintiffs in order to determine their exposure and duties. So according to your analysis, the acts of the boys are irrelevant in considering the issue of whether there's one or two occurrences? Yes, Justice Garland. I do believe that the acts of the boys are irrelevant. Their motivations in entering the pond, whether one jumped and fell and the other entered to try to help him or not, has no bearing on whether or not Donald Parrish's conduct was such that there were separate and intervening human acts by him that somehow caused one boy's death, approximately caused one boy's death, and another separate and human intervening act that caused another boy's death. Well, under that analysis, then, it wouldn't make any difference if these boys entered the area 24 hours apart or if one knew his buddy didn't show up and so he went back to see where he was and jumped in to help him. Under your analysis, if it's totally the conduct of the insured, in this case Mr. Parrish, the risk you've described or the actions you've described are no different. I do believe that a time-space analysis can be relevant in a case with the right set of facts, Your Honor. In other words, I do believe that if a sufficient amount of time passes, and this was the analysis in subcourts, which contrary to counsel's contention, this court did accept in NICOR, if the passage of time is such that it can reasonably be stated or asserted that the nature of the defendant's conduct changed or that the defendant knew or should have known that corrective measures should be taken, then in that event, you may have a separate occurrence, depending on the facts. But it would be a much more extreme and clear set of facts than those presented herein, which indicate that these two boys were together, that they ended up at this pit, and that they both were entrapped in the sand and died. Ms. Golden, isn't the fact that the occurrence provision is a limiting condition? In terms of the burden of proof, Your Honor? Yes. You know, the Reedy case that we cite in our brief states that the determination as to the number of occurrences is really a burden that's placed on the insured. But isn't occurrence, the idea of the term occurrence, a limiting condition? Well, there is an occurrence limitation. But establishing that an occurrence existed. And then, therefore, if it's a limiting condition, shouldn't you have the burden of proof? I do think that the burden should, in fact, be on the insured to establish that an occurrence took place. And that's really what we're talking about here. And I don't think that just because an insurance company files a declaratory judgment action, which many of us do here in Illinois in order to get a determination of our rights to determine that, but even if the burden of proof is on Addison, I think it is clear that we met that burden. What about the Mason case that Nyquist seems to cite with approval, the Appellate Court case? I believe it was a bachelors in case. Well. Two different people, same act, serving tainted food. How do you respond to that case? Well, I think that the Mason case can certainly be reconciled with the cases that the Supreme Court cites in NYCORP. I think that the Mason case focuses on the act of the restaurant in serving the tainted food. It does not address the acts of the plaintiffs in going into the restaurant or in eating the food. And, Justice Gorman, the only other thing I wanted to mention in response to the comments that you had or the questions you had was that in cases such as Gypsum or O'Rourke, there's clearly a long span of time, And, nevertheless, those cases involve one occurrence because they do, in fact, focus on the nature of the defendant's conduct. One case, for example, a fraudulent scheme. In another case, the manufacturer and distribution of a product. So I don't think that just by virtue of the fact that there's a time differential or a geographic differential means that there's more than one occurrence. I think clearly that's not necessarily the case. But I do believe that when you move into hypotheticals like that, the one that you posited, one does see that time and space might, in fact, be looked at in a given case to determine whether or not there was a sufficient passage of time or a sufficient geographical span to result in a finding of two occurrences based on the facts of a given case. I don't think we can just dismiss the Mason case that quickly. I'm so sorry. You said that the focus wasn't on the patrons of the restaurant, it was on the restaurant serving the food. And regardless of where you put the focus, the instrumentality of harm, in that case the tainted food, and the instrumentality of harm here, the excavation pit or whatever we want to call it, is the same. And I don't think you would say that if a boy came along three weeks later and you insured that boy, and that boy went into the pit and died the same way, you wouldn't say, well, we're not liable, because that's really the same occurrence that had occurred three weeks ago with respect to this other boy who went into the pond, right? You wouldn't make that argument. I agree with you. That's what I was trying to address with Justice Garmon. So the idea of even under the time and space analysis, let alone a NICOR analysis, it is important what we review in the record to indicate whether there was, I mean, the pond's not going to change, but whether there was a different intent on the part of the victim or a different time lag between when it occurred. I mean, aren't those things important in this case? The time lag can be important in a given case. I definitely agree with that, Justice Thomas. I do not agree that motivations of plaintiffs are factors that should be considered in determining the cause of a given injury. I think that you have to look at the defendant's conduct in order to make that determination. I don't necessarily disagree with that, but I think that if the second boy, which I believe, I might have it wrong, but I think Hodgins is the second boy, if indeed what's in the record, the record that we review, is that this boy went in to try to save the first boy who was there, right? Yes. That in and of itself says that he could have chosen to walk away and there would have never been the tragedy that occurred with respect to the second boy. If his motivation was to save the first boy, that's what's getting him into this disastrous predicament in the first place, right? And isn't that then more in line with NICOR and Mason that you've provided this and, you know, and certainly it's foreseeable that somebody's going to try to save somebody else? I mean, I'm trying to understand your argument. I don't believe that the motives of the plaintiffs relate to the legal proximate cause of this accident and Donald Parrish's responsibility for it. I think that the only thing that you can look at to determine Donald Parrish's liability is Donald Parrish's responsibility for it. And I think that's what we're talking about in trying to reach that and you agree that you had the burden of proof of that and there's questions. Well, I don't agree that we had it, but I do believe that if this court determines that we had it, that we met it, because the facts of this case, the reasonable inference to be drawn here is that the boys were together, that they entered the pit within a short proximity of time from one another, that they would not have had, Eugene Holland was the plaintiff's expert in the underlying injury case. He testified that... Thank you again. I just want to start by suggesting Ms. Golden and we have fought this through now for some time and Ms. Golden has fought in very good faith and very vigorously, because I want to mention that, because she made some statements which I think are not quite in accord with the record and I know that they were not made in bad faith in any way, shape or form, but I think they need to be rebutted. One, simply put, if you look at the record, you look at the testimony that was stipulated into evidence, and by the way, it's on, I believe, if you look at the record, and I can cite the page, it's Ms. Golden who's speaking when we stipulate all the documents, the photographs, and the testimony, depositions in the record, and we stipulate they're coming in for admissibility. Now, that, I will grant that a weight was reserved, which is fine, but this testimony of the police officers came in without objection. It was never objected to, pure and simple. Now, Ms. Golden suggested that the record shows that the first boy went in and the other boy came in behind him. Well, that's mistaken. It's just not true. The officer testified, and let's go back to the size of his pit. There was a big piece of property which was very large, a few acres. There was a pit somewhere in it which was much smaller. It was maybe 20, 30 feet by, you know, 30, 40 feet. The owner was scooping out sand and putting in clay, and it was that pit inside this depression that the boys were caught. The testimony was uncontradicted by the police officers that they concluded that the second boy, Mr. Hodgins, came in from a different location. Because one boy was caught in water all the way around him with his feet, his both legs, almost entirely submerged in the muck. That's one of the reasons that led them to conclude he came from one direction and jumped that way. We'll say north. The other boy, Mr. Hodgins, was at the edge of the water. Part of his body was not in the water. One leg was caught in the muck, facing directly opposite. And that's why the officers concluded, based on their own personal observations and their forensic training, that it's likely, more likely than not, that they entered from two different locations for two different reasons, for two different purposes. That was undisputed in this case. Mr. Luxinger, I think it's important, though, but I know it's going to be repetitive, because Justice Kramer asked a question during your opening argument. But accepting all that is true. How do you address Ms. Golden, that there was no intervening cause that the tortfeasor here was responsible for? And that that is more in line with NICOR, I think, is her argument. Well, I would say that when you talk about an intervening act, a separate intervening act, here, if you look at Mason, my simple argument is that the NICOR test doesn't require that. And if you look at Mason and Sipkowitz, neither do they. NICOR no more requires that. For instance, in Mason, as you aptly pointed out, Your Honor, it was the same batch of onions. It was the same act. It was the same act of delivering the onions to people. It was, as I see it, Mason and Sipkowitz and NICOR stand for exposure. Separate and intervening exposures of an unsafe act or practice that increase your liability. Again, that's the quote that we have in NICOR. NICOR talks about a separate and intervening human act that increases exposure. That's the key. There's nowhere in NICOR or in Sipkowitz or in Mason does it say that this has to be performed by a tortfeasor. But furthermore, it wasn't just the existence of the unsafe condition in this case that led to the accident. I mean, there were numerous acts of, we alleged, numerous acts of negligence on the part of the landowner. So there were numerous overlapping acts on his part. There was the fact that, and please consider this, I forget the name of the case, but you recall there's a case where there was a plume of smoke and debris and the wind blew it in different directions. And the courts, I forget exactly what case that was, but the courts determined that these are separate and intervening acts because you have different changes in conditions. Here, when these boys get entrapped, there's a storm going on. That's when they went missing. Insofar as one lad, according to the testimony, uncontradicted, likely entered at a different point, at a different location, for a different reason, and we don't know the temporal space, the weather itself could have played a role in why he got caught. So there's a number of competing and overlapping and intervening acts here. And I do want to reach back, though, if I may say, to the fact that Your Honor's hit upon it in your questioning. This is, no one disputed that there was coverage. Once there's coverage, it is the burden of the insurance company to prove that the limiting provision applies. Simply put, they did not meet that burden. They had the burden of proof. The only evidence of record is this evidence of the police officers and the medical examiner who concluded two separate causes of death, technically.  All the other things that Ms. Golden had alluded to, that she believes would demonstrate that she's proven her record, they entered at the same time, they got caught at the same time, none of that's of record. I see my light's on. Thank you very much.